UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DONALD ROGER ROSSIGNOL, JR.,

                    Petitioner,

        v.

WARDEN BLADES, IMSI,

                    Respondent.

Case No. 1:12-cv-00249-CWD

**MEMORANDUM DECISION AND ORDER**

        Petitioner Donald Roger Rossignol, Jr., filed a Petition for Writ of Habeas Corpus

challenging his state court conviction. (Dkt. 1.) Respondent has filed an Answer and a

Brief in Support of Dismissal (Dkt. 20), and Petitioner has filed a Reply. (Dkt. 22.) The

Petition is now fully briefed and ready for adjudication.

        Both parties have consented to the jurisdiction of a United States Magistrate Judge

to enter final orders in this case. (Dkt. 9.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Having reviewed the record, the state court record, and the parties' briefing, the Court

enters the following Order.

**REVIEW OF PETITION**

**1.       Standard of Law for Review of Petition**

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus relief is further limited to instances where the state-court adjudication of the merits:[1]

1.       resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.       resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, for a decision to be "contrary to" clearly established federal law, the petitioner must show that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court

---

[1]A state court need not "give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

precedent, or that the state court confronted a set of facts that are materially

indistinguishable from a decision of the Supreme Court and nevertheless arrived at

a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362,

404-06 (2000).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1), the petitioner must show that the state court was "unreasonable in

applying the governing legal principle to the facts of the case." *Williams*, 529 U.S.

at 413. A federal court cannot grant relief simply because it concludes in its

independent judgment that the decision is incorrect or wrong; the state court's

application of federal law must be objectively unreasonable to warrant relief.

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694

(2002).[2]

In *Harrington v. Richter*, 131 S.Ct. 770 (2011), the United States Supreme

Court reiterated that a federal court may not re-determine a claim on its merits

after the highest state court has done so, just because the federal court would have

made a different decision. Rather, the review is necessarily deferential. The

_____

[2] Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit law may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, "circuit precedent may [not] be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced. . . ." *Marshall v. Rodgers*, 133 S.Ct. 1446, 1450 (2013) (citations omitted).

Supreme Court explained that under § 2254(d), a habeas court (1) "must determine what arguments or theories supported or . . . could have supported, the state court's decision;" and (2) "then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786. If fairminded jurists could disagree on the correctness of the state court's decision, then a federal court cannot grant relief under § 2254(d)(1). *Id.* The Supreme Court emphasized: "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

The United States Supreme Court has recently clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). This limitation applies to cases that were adjudicated on the merits in state court and cases in which the factual determination of the state court is not unreasonable.

When a party contests the reasonableness of the state court's factual determinations, the court must undertake a § 2254(d)(2) analysis. To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id.* The United States Supreme Court has admonished that a "state-court factual determination is not unreasonable merely

because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citations omitted).

The United States Court of Appeals for the Ninth Circuit has identified five types of unreasonable factual determinations that result from procedural flaws that occurred in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim; or (5) when "the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004). State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## 2.    Background

Petitioner was convicted after trial by jury of three counts of lewd conduct and one count of sexual abuse, arising from criminal charges filed in the Second Judicial District Court in Moscow, Idaho. The victim was Petitioner's seven-year-old daughter, S.R., who had come to live with him for the first time after her

mother died. Petitioner was also found to be a persistent violator in the same criminal proceeding. On May 31, 2007, a judgment of conviction was entered, and Petitioner received sentences amounting to 30 years fixed, with 10 years indeterminate. He filed both a direct appeal and a post-conviction action in state court prior to filing his Petition for Writ of Habeas Corpus in federal court.

Petitioner brings three claims: (1) that Petitioner's attorney did not allow him to testify, or, alternatively, that Petitioner did not knowingly or voluntarily waive his right to testify; (2) that trial counsel did not properly prepare for trial, including a failure to subpoena a key witness; and (3) that the state district court hindered Petitioner's ability to present a viable defense regarding admission of an incomplete taped interview with the victim.

## 3. Denial of Right to Testify at Trial and Ineffective Assistance Claim

### A. *Standard of Law*

An accused's right to testify is a constitutional right of fundamental dimension, but a right that is not without limitations. *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987). The *Rock* court acknowledged that the right to testify "'may, in appropriate cases, bow to accommodate other legitimate interest in the criminal trial process.'" *Id.* at 56 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)).

The right to testify may be waived by the defendant. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). A waiver is valid as long as it is knowing, voluntary, and intelligent. *United States. v. Ruiz*, 536 U.S. 622, 629 (2002).

In a criminal case, the defendant "has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). In *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), in the context of determining whether a defendant had waived his right to counsel, the United States Supreme Court opined that a defendant's relinquishment of a constitutional right must be voluntary and knowing, and "[w]hether there has been an intelligent waiver of a constitutional right must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background experience, and conduct of the accused."

Counterbalancing the right to testify are important implications arising from a defendant's choice to be represented by counsel. The *Jones* Court explained: "The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." 304 U.S. at 465. Whether a defendant testifies is usually attributed to the tactical strategy of counsel, who has weighed the benefits and risks of testifying, including exposing the defendant to cross-examination. The

Supreme Court has opined that, "absent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed v. Ross*, 468 U.S. 1, 13 (1984).

In cases where a court finds that a defendant was denied the right to testify, there is no indication from the United States Supreme Court that harmless error would not apply to determine whether relief was warranted. *See Rose v. Clark*, 478 U.S. 570, 576-79 (1986); *Brooks v. Tennessee*, 406 U.S. 605, 613 (1972).[3]

In Petitioner's case, the Idaho Court of Appeals rejected the constitutional claim, but alternatively performed a *Chapman*[4] harmless error analysis to determine that, even assuming Petitioner was deprived of the right to testify, he would not be entitled to relief. The Court of Appeals "was convinced beyond a reasonable doubt that, even if Rossignol had testified, the jury would still have found Rossignol guilty of all counts." (State's Lodging D-5, p. 13.)

The United States Supreme Court has clarified that, when a state appellate court has undertaken a *Chapman* harmless error review, the federal district court reviewing the decision under § 2254 applies the *Brecht* harmless error analysis.

---

[3] The Court rejects Petitioner's invitation to apply *United States v. Butts*, 630 F.Supp. 1145, 1148 (D. Me. 1986), to the question whether a harmless error analysis should be undertaken. Another court recognized that the *Butts* opinion, holding that the harmless error doctrine should not be applied to denials of the right to testify and that automatic reversal is required, noted that the *Butts* decision "has not been followed by other federal courts. Indeed, only one other jurisdiction [Minnesota] appears to apply a similar rule." *Moman v. State of Tennessee*, 18 S.3d 152, 167 n.18 (Tenn. 1999).

[4] *Chapman v. California*, 386 U.S. 18 (1967).

*See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review") (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638.

The Idaho Court of Appeals also reviewed the right-to-testify issue as a claim that Petitioner was deprived of the effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). The first prong of the *Strickland* test, "deficient performance," requires a showing that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, or was "outside the wide range of professionally competent assistance," *id.* at 690.The test is "highly deferential," evaluating the challenged conduct from counsel's perspective at the time at the time counsel acted. *Id.* at 689.

The second prong of the *Strickland* test, "actual prejudice," requires the petitioner to demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Ineffective assistance of counsel claims fall under the "doubly deferential" lens of habeas corpus. *See Cullen v. Pinholster*, 131 S.Ct. at 1403. That is, a court

must take "[1] a highly deferential look at counsel's performance, [2] through the deferential lens of § 2254(d)." *Id*. (internal citation and punctuation omitted).

Where *Strickland* governs the constitutional question, a harmless error analysis need not be performed, because a showing of actual prejudice, which is a reasonable probability that the outcome would have been different, is enough to find the error harmful. *Walker v. Martel*, 709 F.3d 925, 939 n.4 (9th Cir. 2013). However, where a federal district court is reviewing the underlying constitutional issue, without the *Strickland* overlay, *Brecht* is the appropriate standard to use.

As the Court will explain, under the facts and circumstances of this case, Petitioner cannot show that his right to testify at trial was violated, and, even assuming that he can, he cannot prevail on habeas corpus review under the *Brecht* "substantial and injurious effect" standard. Nor can Petitioner prevail under the *Strickland* actual prejudice standard when his claim is cast as an ineffective assistance claim.

**B.** **State Court Proceedings and Idaho Court of Appeals's Decision**

Petitioner was represented by Seattle attorney David Marshall and Idaho attorney Sunil Ramalingam at both trials. The failure-to-testify claim was the subject of an evidentiary hearing in Petitioner's post-conviction proceedings.

At the post-conviction hearing, Petitioner testified that his counsel had not informed him that he, as the defendant (rather than the defense attorneys), had the

right to make the ultimate decision whether he would testify at trial. (State's Lodging C-2, p. 26.) His lawyers did not contradict that testimony. The state district court reviewed all of the circumstances of the case to determine whether–despite the failure of counsel to verbalize to Petitioner that the ultimate decision rested with him–Petitioner knew he had that right. There is no United States Supreme Court precedent particularly supporting Petitioner's argument that, even though he knew he had the right to testify, the lawyers' failure to verbalize the ultimate decision-making power to the client automatically requires a grant of the writ. Therefore, the Court looks at the totality of the record to determine whether Petitioner knowingly, voluntarily, and intelligently waived the right to testify at trial in the context of his choice to be represented by counsel, as *Johnson v. Zerbst* instructs.

At the evidentiary hearing, Petitioner testified:

> I knew I had a right to testify, but my understanding all the way even through the second trial is whatever happened the decisions for whatever goes on in my case is my attorneys [sic]. He makes the ultimate decision. I mean, he's – you pay him to make the proper decisions in the case. I knew I have a right, but he's the decision maker as to what needs to be done or what's best to be done in a case.

(State's Lodging C-2, pp. 13-14.)

Petitioner testified that his belief that the lawyers were to make the final decision on whether he testified at trial was based either on television or from his

observation that the attorneys were "in charge" in court, rather than from anything his attorneys told him. (State's Lodging C-2, pp. 13-14.) He admitted that his attorneys never told him it was *their* decision whether he would testify, nor did they state to him that they were refusing to put him on the stand. (*Id*., pp. 40-41, 46.) Rather, when Petitioner told his attorneys that he wanted to testify, they (1) expressed concern because of his prior convictions and a perjury allegation arising from child protection proceedings regarding abuse of his daughter, (2) indicated that the attorneys would meet and discuss whether he should testify, and (3) told Petitioner they would inform him of their collective decision as to whether he should testify.

Despite Petitioner's current position that he really wanted to testify, he never decided to testify in contravention to what his counsel had decided was best for his defense, and he never attempted to fire his attorneys. (State's Lodging C-2, p. 42.) Neither did Petitioner notify the trial judge that his attorneys would not allow him to testify. (*Id*.) On rebuttal at the post-conviction hearing, Petitioner clarified that "neither Mr. Marshall nor Mr. Ramalingam ever told [Petitioner], no, you may not testify." (*Id*., p. 46.)

Both of Petitioner's counsel, David Marshall and Sunil Ramalingam, testified that they advised Petitioner not to testify because it would be devastating to his case, and the prosecutor would be able to impeach him and destroy his

defense. (State's Lodging C-2, pp. 48 to 69.) On examination, lead counsel Mr.

Marshall testified as follows:

> Q:  And did [Petitioner] ever insist to you or demand of
> you that he testify?
>
> A:  No.
>
> Q.  Did you ever tell him that you were refusing to let him
> testify?
>
> A.  No.
>
> Q.  And to – to your knowledge at least did Mr.
> Ramalingam ever say Mr. Rossignol cannot testify?
>
> A.  No.

(*Id.*, p. 55.)

On examination at the post-conviction hearing, second-chair counsel Mr.

Ramalingam testified:

> Q.  And did [Petitioner] ever state to you that he insisted to
> testify?
>
> A.  He stated to me that he was very upset that he wasn't
> going to be able to testify; that we didn't want him to
> testify. I know he didn't like that, but I thought he
> understood why we had come to that decision. I don't
> think it made him happier, but I thought he had
> understood that.
>
> * * *

> Q. If Mr. Rossignol had maintained to you his intent to testify that he insisted, if you will, that he testify would you have let him testify.
>
> A. I think we had to.
>
> Q. So ultimately that's a yes?
>
> A. Yes.

(*Id.*, pp. 67-78.) Mr. Ramalingam further testified that, on the night before the last day of trial: "Don made his feelings very clear to me that he wanted to testify, and I told him why we didn't want him to." (*Id.*, p. 69.)

Mr. Marshall, lead counsel with about 20 years of experience as a criminal defense attorney and 50 jury trials under his belt, testified that he had never prevented a criminal defendant from testifying nor told a defendant it was not the defendant's choice whether to testify. (*Id.*, pp. 48-51.)

On post-conviction review, the state district court analyzed and decided the claim not as an ineffective assistance of counsel claim, as it was pleaded, but as a claim of whether Petitioner waived or was denied his constitutional right to testify at trial. (State's Lodging C-1, pp. 232-33.)

In a written memorandum decision issued after the post-conviction hearing, the state district court determined: "I do find that the facts of this case show Mr. Rossignol waived his right to testify." This finding was based on several facts: (1) Petitioner "knew he had the right to testify"; (2) the court "personally informed

him during his arraignment that he had the right to testify"; (3) Petitioner was "clearly not the type of person to give in when he believes somebody is obstructing his rights"; (4) Petitioner previously had asserted, without any reticence, that the court was denying him his rights; (5) the trial record reflected that Petitioner constantly conferred with counsel throughout trial and throughout the post-conviction hearing; (6) Petitioner never testified that either counsel told him he could not testify at trial; and (7) Petitioner characterized the relationship between himself and counsel as one in which he deferred to their decision-making because he was paying them to make the right decisions for him. (State's Lodging C-1, pp. 232-33.)

The state district court also made a credibility determination: "I simply do not believe that a man that has repeatedly shown himself to be assertive and intimately involved with his own trial strategy, even interrupting his lawyer while his lawyer cross-examines an opposing witness, would not have asserted his known right to testify if he wished to." (State's Lodging C-1, p. 234.) The state district court further found that "although Mr. Rossignol did ask repeatedly to testify, he was each time thereafter convinced by his counsel that he should not testify." (*Id.*)

On appeal, the Idaho Court of Appeals noted the inconsistency between the manner in which the post-conviction claim was pleaded, and the manner in which

the state district court decided it. (State's Lodging D-5.) As a result, the Court of Appeals decided the claim three ways: (1) a denial or waiver of the right to testify; (2) harmless error; and (3) ineffective assistance of counsel. Petitioner's claims was rejected under all three theories.

The Idaho Court of Appeals found that the extensive record from the post-conviction evidentiary hearing supported the trial court's determination that "Rossignol did not meet his burden to show he was deprived of the right to testify at trial." (State's Lodging D-5, p. 12-13.) The appellate court also agreed with the state district court's conclusion that, even if Petitioner had been denied the right to testify, the error was harmless. The state district court had explained: (1) "there was absolutely no doubt . . . that [Rossignol] was guilty of the crimes charged"; (2) had Petitioner testified, his "forgery conviction and his perjury at the child protection hearing would have obviated any marginal benefit his testimony may have had"; (3) Petitioner would also have been subject to cross-examination on the fact that Petitioner had fled the jurisdiction before trial; and (4) Petitioner would have been subject to questions about the thousands of pornographic images and three father-daughter incest stories discovered on his computer. (State's Lodging C-1, p. 234.) Likewise, in affirming the conviction, the Idaho Court of Appeals was "convinced, beyond a reasonable doubt that, even if Rossignol had testified, the jury would still have found [him] guilty of all counts. As such, even if

Rossignol was deprived of his right to testify at trial, such error was harmless."

(State's Lodging D-5, p. 13.)

Finally, the Idaho Court of Appeals considered whether Petitioner's counsel had been ineffective. For the same reasons, the court of appeals rejected the claim, concluding: "[E]ven if Rossignol's counsel was deficient for failing to inform Rossignol that the ultimate decision whether to testify was his, Rossignol cannot show that such deficiency resulted in prejudice and, therefore, cannot prevail on his ineffective assistance of counsel claim." (State's Lodging D-5, p. 13.)

C.    *Discussion*

(1)    § 2254(d)(2) Analysis: Determination of the Facts

Petitioner argues that the state district court and the Idaho Court of Appeals made an unreasonable determination of fact based on the evidence presented in the post-conviction matter. His § 2254(d)(2) argument is one that the state court "fail[ed] to consider and weigh relevant evidence that was properly presented to the state courts and made part of the state-court record." *Taylor v. Maddox*, 366 F.3d. at 1001. In such instance, the *Taylor* Court explained how to analyze such a claim:

> In considering this kind of claim, we are mindful that the state courts are not required to address every jot and tittle of proof suggested to them, nor need they "make detailed findings addressing all the evidence before [them]." *Miller–El*, 537 U.S. at 347, 123 S.Ct. 1029. To fatally undermine the state fact-finding process, and

render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim. In other words, the evidence in question must be sufficient to support petitioner's claim *when considered in the context of the full record* bearing on the issue presented in the habeas petition.

366 F.3d at 1001 (emphasis added).

Petitioner argues that the state courts should have focused their factual inquiry not on what was found on his computer, but on what was *not* found: (1) there was no evidence of child pornography on his computer; (2) the pornography found was accessed but not saved on his computer; (3) there was no evidence that Petitioner conducted a Google- or Yahoo-type search for pornographic websites; (4) there was no evidence he opened the pictures or stories that were found within the hard-drive; (5) no memberships to pornographic websites were found; and (6) there was no evidence of elimination software used on the computer prior to Petitioner turning the computer over to the forensic investigator. (Reply, Dkt. 22, p. 7.)

On habeas review, the evidence allegedly *not* considered must be viewed in the context of the whole record, which showed: (1) about 800 movies, of which over half were adult pornographic movies; (2) between 18,000 and 38,000 still pictures or graphics, about half of which were adult pornographic images;[5] and (3)

---

[5] The computer expert witness, Richard Goldston, explained that if a viewer visited a website that showed a display of various "thumbnail" photos, then hundreds of thumbnails could be loaded onto his computer, without even viewing or enlarging a thumbnail photograph. (State's Lodging A-12, pp. 895-

eleven incest stories, of which three involved father-daughter relationships. (State's Lodging B-3, p. 8.) Richard Goldston, the prosecution's computer expert witness, testified at trial about how he examined Petitioner's computer and the results of his investigation. (State's Lodging A-12.)

While the images were not of child pornography, the images reflected some of the types of sexual activity that Petitioner was accused of engaging in with S.R., corroborating S.R.'s testimony. In addition, the existence of the photos corroborated the testimony of S.R. that Petitioner showed her pornographic images on his computer in conjunction with the inappropriate touching instances. The father-daughter incest stories were consistent with evidence of a plan or motive.

The type of websites and the timing of when Petitioner accessed the websites also corroborated S.R.'s version of events–that Petitioner sexually abused her when Petitioner's wife was traveling to or attending college classes or was asleep very early in the morning.[6] Mr. Goldston testified that Petitioner's computer accessed a list of pornographic websites on specific dates and times, all of which

---

97.)

[6] Mr. Goldston testified that the times indicated on the reports may have to be adjusted one hour to account for the difference in the time zone of his office in Meridian, Idaho, and the Pacific time zone. (State's Lodging A-12, p. 857.)

had left identifying "cookies" on the computer, reflected on Mr. Goldston's forensic report.[7] (State's Lodging A-12, pp. 842-880.)

The prosecution highlighted the details of the websites and the timing during closing arguments: (1) "schoolbuschicks.com" on August 23, 2005, at 10:07 a.m.; (2) "teensforcash.com" (no date specified); (3) "pureteenX.com" on September 11, 2005 at 4:27 a.m.; (4) "naughty.com" on September 9, 2005, at 4:37 a.m.; (5) "dirtybabysitter.com" on August 23, 2005, at 10:00 a.m.; (6) "SexxxyLolita.com" on August 27, 2005, at 3:23 a.m.; and "DaddysBabes.com" on August 27, at 3:22 a.m. (State's Lodging A-15, pp. 1586-88.)[8] The three father-daughter incest stories accessed on Petitioner's computer were as follows: (1) "Even in the Best of Families," accessed on September 7, 2005, at 5:30 a.m.; (2) "Oh, Adrian, Sweet Adrian," accessed on September 7, 2005, at about 5:45 a.m.; and (3) "Make Me Pregnant Daddy," accessed on September 25, 2005, at about 6:25 a.m. (*Id.*)

On this record, including the testimony of the witnesses (detailed below in the harmless error analysis), the Idaho Court of Appeals determined that the

---

[7] Mr. Goldston testified that the temporary files on Petitioner's computers were deleted every 20 days by default by Windows, and so there was only 20 days' history on the computer to analyze. (State's Lodging A-12, p. 900.)

[8] The closing argument was not evidence, but reflected the evidence contained in Mr. Goldston's report; there was no objection from defense counsel that the information in the closing argument was an inaccurate reflection of the information contained in the forensic report from Petitioner's computer.

"evidence against Rossignol was compelling," and, consequently, his testimony would not have aided in his defense. "[H]is forgery conviction, his perjury at a child protection hearing, and his flight from the jurisdiction before trial, which would have been disclosed during cross-examination, would have obviated any marginal benefit his testimony may have had." (State's Lodging D-5, p. 13.) On the same record placed before the state courts, this Court concludes that Petitioner has not shown that the Idaho Court of Appeals overlooked evidence that was "highly probative and central to petitioner's claim." *Taylor*, 366 F.3d at 1001.

With his argument that the computer evidence could be viewed in two different ways, Petitioner is simply highlighting the favorable points of the evidence and ignoring the unfavorable points–*all* of which were presented to the jury, leaving the jury to decide the truth of the matter. Petitioner's counsel cross-examined Mr. Goldston and made a detailed, extensive argument to the jury about why the computer evidence was not accurate or compelling. Petitioner's argument does not show that the Idaho Court of Appeals made an error in reviewing what the jury found based on the evidence that was before the jury. To the extent that Petitioner argues that additional errors or omissions of fact were made, the Court rejects that argument without further discussion. Accordingly, Petitioner has not met his burden to show that he merits relief under § 2254(d)(2), on an "unreasonable determination of the facts" theory.

(2)    § 2254(d)(1) Analysis: Law Applied to the Facts

The Court now turns to a § 2254(d)(1) analysis–whether the Idaho Court of

Appeals's decision was contrary to, or an unreasonable application of, United

States Supreme Court case law.[9] Petitioner had the benefit that the Idaho Court of

Appeals considered his claim under three different legal standards. This Court

agrees that the state court record supports a finding and conclusion that Petitioner

knew he had the right to testify at trial, but he voluntarily and intelligently deferred

to the judgment of his attorneys because they had expertise and experience in

making such decisions in the context of the totality of the evidence. The record

does not support Petitioner's allegation that trial counsel simply "refused [his]

continuous demands to testify on his behalf at trial," but it instead shows that the

attorneys and Petitioner counseled together, the attorneys counseled with each and

decided among themselves that Petitioner's testimony would be harmful to his

defense, and, though he disagreed, Petitioner decided to defer to his counsel and

follow their advice. (State's Lodging D-5, p. 2.) The record does not reflect a

"demand" or a "refusal of a demand." (*See* State's Lodging C-2.) No force or

coercion is evident in the record. (*Id.*)

---

[9] The Court will perform a § 2254(d)(1) analysis, which is relevant to the extent that it is not subsumed by a *Brecht* harmless error analysis. *See Fry v. Pliler*, 551 U.S. 112, 120 (2007).

While the record tends to show that it was the defense attorneys who "decided" Petitioner should not testify because it would harm his defense, Petitioner ultimately decided to agree with them. His agreement is shown by the fact that (1) he did not testify; (2) he did not fire his attorneys; (3) he did not tell the court that his attorneys refused to let him testify; and (4) his attorneys did not perceive Petitioner's requests to testify as a demand, because–if it had been a demand–they would have permitted him to testify, based on their knowledge of and experience with criminal law, as they testified at the hearing. The record also tends to show that Petitioner had the knowledge and ability to assert his right to testify, had he wanted to.

The *Harrington* decision points out that, under § 2254(d), a habeas court (1) "must determine what arguments or theories supported or . . . could have supported, the state court's decision;" and (2) "then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786. If fairminded jurists could disagree on the correctness of the state court's decision, then a federal court cannot grant relief under § 2254(d)(1). *Id.*

The analysis above shows that some fairminded jurists would agree with the Idaho Court of Appeals, and some might agree with Petitioner. However, the bottom line is that, because Petitioner has not shown that all fairminded jurists

would agree with him that the Idaho Court of Appeals's opinion contravenes United States Supreme Court precedent governing the right to testify, he has not shown that the opinion is contrary to, or an unreasonable application of, United States Supreme Court case law governing the right to testify.

Moreover, cases from the federal circuit courts (which can be used only to help gauge whether a state court decision was reasonable), generally follow the rule that, when a defense attorney makes a tactical decision not to have the defendant testify, the defendant's assent is presumed." *U.S. v. Webber*, 208 F.3d 545, 550, 550-51 (6th Cir. 2000.) In *United States v. Pino-Noriega*, the United States Court of Appeals for the Ninth Circuit explained:

> [W]hile waiver of the right to testify must be knowing and voluntary, it need not be explicit. A defendant is presumed to assent to his attorney's tactical decision not to have him testify. The district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right. Waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so. A defendant who wants to reject his attorney's advice and take the stand may do so by insisting on testifying, speaking to the court, or discharging his lawyer. When a defendant remains silent in the face of his attorney's decision not to call him as a witness, he waives the right to testify.

189 F.3d 1089, 1094-95 (9th Cir. 1999) (internal punctuation and citations omitted).

Therefore, circuit law supports the conclusion that the decision of the Idaho Court of Appeals was reasonable on the underlying claim that Petitioner was denied his right to testify at trial. The ineffective assistance of counsel decision is discussed in a separate section below. For all of the foregoing reasons, the Court concludes that the decision of the Idaho Court of Appeals was not contrary to, or an unreasonable application of, United States Supreme Court precedent.

(3)    Harmless Error Analysis

The Court next turns to a *Brecht* harmless error analysis. In so doing, it will summarize the most important evidence that was offered at trial, and will discuss the harmful evidence that was avoided by Petitioner remaining silent in accordance with his counsels' advice.

At the age of seven, S.R. came to live with her father and his new wife, Nancy, in July 2004. On September 16, 2005, S.R. revealed to a friend that Petitioner had inappropriately touched S.R. The friend's mother contacted the Idaho Department of Health and Welfare (IDHW). On September 19, 2005, two IDHW social workers, Jennifer Shuffield and Chrystal Hanson, accompanied by a uniformed police officer, visited Petitioner's home and informed Petitioner and Nancy that they had received an anonymous call about allegations of sexual abuse of S.R. (State's Lodging A-13, p. 1339.) The social workers interviewed S.R. at a

picnic table in Petitioner's yard, while Petitioner stood in the yard within sight of the interview. (State's Lodgings A-14, pp. 1402-03; A-12 , p. 976.)

The social workers asked S.R. if there was anything that had happened that made her feel uncomfortable and unsafe. (State's Lodging A-12, p. 971.) S.R. did not repeat the sexual abuse allegations to the social workers, but instead told them an obviously false story about people who looked like prisoners that came to her school to kidnap children by throwing them in the back of a truck and driving away. (State's Lodging A-2, pp. 413-14.; A-13, pp. 1338-39.)

S.R. had also told her friend and her stepmother (Nancy) about the prisoner story, and she had asked a police officer she saw at a bike fair about what type of clothing prisoners wore. (State's Lodging A-11, pp. 830-31.) At trial, S.R. testified that one of her friends told her about the prisoner story, and that she was not sure whether she told Chrystal and Jennifer, the two social workers, that she had seen the kidnaping herself. (*Id*., p. 832-34.)

Nancy testified that, on or about September 21, 2005, S.R. asked Nancy if she could speak to her alone, without Petitioner present. Nancy testified that they went into S.R.'s room, and S.R. told Nancy:

> She said – she started by saying something about massaging, that he was either teaching her massaging or something like that. And she said, it wasn't a good massage. And I don't remember if she said the exact words or anything, but I remember her pointing to her chest. And then she said something about him pulling up her

nightgown and putting his finger in her hole. And then she said, mom, did you know there's a hole down there?

(State's Lodging A-13, pp. 1339-52.) Nancy testified that she did not believe S.R., told S.R. she thought she was lying, and told Petitioner about the allegations generally. (*Id.* at 1352-53; State's Lodging A-14, p. 1401-02.)

S.R. then disclosed the same information to her grandmother, Pat Howard, by telephone, who later responded to questioning at trial as follows:

Q.   After Nancy put [S.R.] on the phone what did [S.R.] say at first?

A.   You know your son Don.

Q.   Did that strike you in any way?

A.   Yes.

Q.   Why?

A.   She never referred to him as my son or Don before.

Q.   What did she say your son Don had done?

A.   He touched my private parts.

Q.   What did you say to her then?

A.   I said to her, why didn't you tell me this when I was there?

Q.   And did she tell you why she hadn't told you that while you'd been here?

A.   She said, because it never happened before.

Q. Did you challenge her on what she was saying to you?

A. Yes, I did.

Q. What did you say to challenge her?

A. I asked her if she was lying or telling a lie.

Q. Did she tell you whether she was telling a lie?

A. Yes.

Q. What did she say?

A. She said she was lying.

Q. Did she say whether she had lied to Nancy?

A. Yes.

Q. What did she say about that?

A. She said she told her a lie.

Q. I'm sorry?

A. She said she told a lie.

Q. Did you tell [S.R.] whether she should tell Nancy that she had lied?

A. Yes, I did.

(State's Lodging A-14, pp. 1441-42.)

After that conversation, S.R. told Nancy that Petitioner had not sexually abused her. (State's Lodging A-13. at 1353.) Nancy testified that she discussed

with S.R. the potential implications of telling other people about the alleged sexual

abuse:

> I just remember trying to stress to her that we got her a
> counselor and that it's not a good idea to be talking to people at
> school about anything because they might not understand or they
> might misunderstand, and that if she did, that something bad might
> happen.
>
> * * *
> I said something like, if something – if something happened to
> daddy or they made daddy go away then what would we do, where
> would we go.

(*Id.*, p. 1359-60.)

 S.R. had been participating in a school mentoring program called the "Bear

Buddy" program during the previous and the current school year. Clara Hill, a high

school senior, was assigned to be S.R.'s mentor. On or about September 22, 2005,

the day after S.R. spoke to Nancy and her grandmother, Petitioner decided it was

best to remove S.R. from the Bear Buddy program immediately. (State's Lodging

A-13, p. 1360.) When Petitioner emailed to Clara Hill to remove S.R. from the

program, an inference that could be drawn from the email was that a counselor of

S.R. had recommended that she not participate in anything other than the new

counseling. (State's Lodging A-12, p. 987.) S.R. did not have a counselor at that

time.

When Ms. Hill heard this news, Ms. Hill and the program directors decided that Ms. Hill should meet with S.R. to say good-bye. During that meeting on September 28, 2005, when the two were alone, S.R. told Ms. Hill about a "really, really big secret." (State's Lodging A-12, p. 991.) The secret was that her father was teaching her about massaging, but, S.R. explained, it was really not massaging, "because it's in my private places." (*Id*., p. 993.) S.R. pointed to her chest and crotch. (*Id*.) S.R. asked Ms. Hill if she knew what a boy's private parts looked like, and Ms. Hill said she did. S.R. said, "Well, my dad makes me put my mouth on his." (*Id*.)

S.R. then said that were "really bad things, too." S.R. explained that her father showed her "pictures of men and women having S-E-X." (State's Lodging A-12, pp. 992-94.) S.R. also told Ms. Hill that, "that's how she knows her dad wants to have sex with her because the other times he showed her the pictures first." (*Id*., p. 994.)

Ms. Hill brought S.R. to Betty Heidelberger, the school counselor, and S.R. repeated the descriptions to Mrs. Heidelberger. (State's Lodging A-12, pp. 1026-1028.) Detective Margaret Lehmbecker and Health and Welfare Investigator Rhonda Schultz were called to interview the child. Lehmbecker testified that S.R. described Petitioner sexually abusing her to them during the interview, and

Lehmbecker said that Petitioner showed her "icky pictures" on his computer. (State's Lodgings A-13, p. 1097.)

Nancy testified at trial that S.R. did now know about the pornography on Petitioner's computer at all. (State's Lodging A-14, p. 1422.) S.R. was removed from her home and placed in state custody after the interviews at the school, and Petitioner's computer was seized by law enforcement officers. (*Id*.)

The State held a child protection hearing regarding S.R., based on the same allegations. At that hearing, Petitioner was untruthful about the circumstances of a prior forgery conviction and about whether his wife had adopted S.R. As a result, the State filed perjury charges against Petitioner for testifying in a substantially false manner.

Petitioner and his wife fled the jurisdiction after the perjury issue arose but before his bond was to be raised in the criminal matter. Petitioner's release on his own recognizance was revoked when he failed to appear at the bond hearing. The jury trial date was vacated, and the court issued a bench warrant. Petitioner turned himself in to authorities two months later.

At trial, Nancy deviated from her prior testimony several times in a manner that would have been favorable to Petitioner, but the prosecution brought forward her prior testimony to impeach her. Nancy admitted that she had earlier testified that the child rarely lied and that no one but Petitioner used his computer. (State's

Lodging A-14, pp. 1395-1407.) Nancy testified that Petitioner usually would get up earlier than she would (*id*., pp. 1398-99), which matched S.R.'s story that Petitioner would sometimes wake her up and take her with him to his office, where he would place her on his lap (he would be in pajamas or nude) and have her look at the pornography on his computer with him.

Detective Lehmbecker testified that she executed a search warrant on Petitioner's home after a bench warrant was issued for his failure to appear at the hearing, and that she found a notebook and a Bottle Bay Resort and Marina price list next to the notebook. (State's Lodging A-13, p. 1099.)

Petitioner's counsel asked Nancy to explain their flight from the jurisdiction. (State's Lodging A-13, p. 1372.) She testified about believing they had lost S.R., feeling hopeless and suicidal, feeling the great injustice of the prosecution and trying to enlist newspapers to help them, and her depression and anxiety. (*Id*.) Lori Freeman, the director of an animal shelter where Petitioner left his two dogs and a cat when he fled, testified that Petitioner indicated he was being transferred by the military to another location that would not allow him to have his pets. (State's Lodging A-13, p. 1116.)

As a result of the defense decision not to have Petitioner testify, the jury did not know about the perjury charges arising from the child protection hearing, the prior forgery conviction, or the false representation regarding the adoption.

As part of the defense case, Petitioner called Dr. Walter Rand Walker, a psychologist, to testify about detachment disorder and hypererotocism in children to support an argument that S.R. suffered from these conditions, which, in turn, led her to fabricate the sexual abuse allegations. (State's Lodging A-14, p. 1466, *et seq.*; State's Lodging A-15, pp. 1633-36.)

To support the hypererotocism defense, Petitioner's counsel called as a witness a woman who babysat S.R. in March 2005, who testified that S.R. told her a secret, and the secret was that S.R. wanted to french kiss a boy and that S.R.'s previous babysitter told her all about sex. (State's Lodging A-13, p. 1137.)

S.R.'s first grade teacher testified that S.R. seems to be "very boy crazy" in the first grade. (*Id.*, p. 1180.) She also testified that the parents seemed to put a lot of pressure on S.R. to perform well academically. (*Id.*, p. 1184.) S.R.'s second grade teacher said she became concerned with S.R.'s sexual precociousness when S.R. wrote that she wanted a date and a "hot" (sexy) dress. (State's Lodging A-12, pp. 1049-52.)

Both Nancy's parents and Petitioner's parents testified that they saw nothing inappropriate or uncomfortable about the father-daughter relationship during July 2005 during extended vacations, but that all the family members seemed happy and were adjusting to their new lives together. (State's Lodging A-13.)

In closing arguments, the prosecution argued that the record revealed no plausible motive for S.R. to fabricate her story. Nancy testified that S.R. was very angry with Petitioner because he gave away her hamster prior to S.R. reporting the sexual abuse to her friend. Nancy also stated that Petitioner punished S.R. for hiding her homework in her locker by taking away her television privileges for a week. (State's Lodging A-13, p. 1366.) The television punishment occurred about one day prior to S.R.'s last meeting with Clara Hill, but after the report to S.R.'s friend.

Clara Hill, S.R.'s mentor, and Rhonda Schultz, the social worker who interviewed S.R. at the school, both testified that S.R. told them that she was afraid that Petitioner would get taken away, and that she and Nancy would have to "live on the streets."[10] (State's Lodging A-13, p. 1077.)

It is clear from the record that S.R. was aware that Petitioner provided her with the necessities of life, which had been woefully inadequate during the first half of her life with her natural mother, and that if she told, those necessities were in jeopardy. Yet, she went ahead with disclosure despite the risks, because, as she testified, she believed that type of "massage" was wrong, and it bothered her:

---

[10] The Court agrees with Petitioner that the witnesses testified only that *S.R.* said she would be out on the streets if Petitioner was taken away, and Nancy testified that *she* told S.R. something similar. There was no testimony that S.R. reported that *Petitioner* told her she would be out on the streets if she disclosed the secret, as the State has characterized the testimony. (See Reply, Dkt. 22, p. 17.) The only testimony regarding Petitioner's statements from witnesses was that S.R. said that Petitioner told her it was a "secret" that she should not tell anyone.

| | |
|---|---|
| Q. | How did you feel when your dad was doing this to you? |
| A. | Bad. |
| Q. | Why is that? |
| A. | Because I didn't like it. And I felt like since he told me not to tell anyone that I just wanted to end [sic] because I knew it was wrong. |

(State's Lodging A-11, p. 806.)

Petitioner argues that not permitting him to testify was harmful error, based on the jurors' difficulty in deciding the case without his testimony. The first trial ended in a mistrial when the jury could not reach a unanimous verdict after four days of deliberation. (Reply, Dkt. 22, p. 2.) In post-trial interviews, the jurors indicated that they never reached a vote, because they had too many different opinions, and that they would like to have heard Petitioner's testimony. (*Id*., pp. 2, 9.) Similarly, Petitioner argues, the jury deliberated for three days in the second trial, wanted further instructions about what "reasonable doubt" meant, and then came back the next day and convicted Petitioner on all counts. (*Id*., p. 2.)

The fallacy in Petitioner's thinking is that he is convinced that the juror interviews and the lengthy deliberations meant that, *had* he testified at either trial, the result would have been *an acquittal*. However, Petitioner's counsel took into

consideration the juror interviews from the first trial, and counsel still decided that testifying would have "destroyed" Petitioner's defense in the second trial.

Importantly, Petitioner has not addressed the fact that he did not bring forward sufficient evidence in the post-conviction matter to demonstrate that testifying would have greatly increased the chances of his acquittal. Petitioner certainly had some favorable testimony to offer, such as how he did not hesitate to take his daughter into his home when her mother (his ex-wife) unexpectedly died, how he worked to provide his daughter with the necessities of life after she had been severely neglected while in her mother's care, how he consulted regularly with his parents and in-laws to determine different parenting techniques, and how he made sure his daughter had regular medical and dental care. (State's Lodging C-2, pp. 20-23.)

However, obviously missing from Petitioner's post-conviction testimony is any particular content that would have shown that the child's sexual abuse story was implausible. He offered no explanation of or a challenge to the forensic analysis of his computer that showed that it contained three father-daughter incest stories. He did not explain why the pornographic websites were accessed during time periods that matched S.R.'s reports of abuse. In addition, while Nancy had addressed fleeing from the jurisdiction, Petitioner would have had to do so again from his point of view, as well as explain the forgery conviction, the perjury

charges, and the substance of the alleged untruths at the child protection hearing. (State's Lodging D-5, p. 13.)

The state court record reflects that the state district court underwent a careful and detailed analysis of (1) the testimony of Petitioner's two counsel at the post-conviction hearing, (2) Petitioner's testimony, and (3) the totality of the evidence available to defense counsel and the prosecution at trial. At the second level of state court review, the Idaho Court of Appeals further pondered all of the evidence in a reasonable manner, concluding that Petitioner was not entitled to relief regarding his failure to testify under any available legal theory.

Under *Brecht*, a federal habeas court cannot grant a writ of habeas corpus on a constitutional error unless the error had "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638. This Court agrees with the state courts that the record does not reflect anything that Petitioner would have added, if he had testified, that would have changed the outcome of the case, given the strong evidence supporting the conviction in the record. Petitioner's proposed testimony that he loved his daughter and did not sexually abuse her would not have refuted the other particular evidence in the record showing he had time, opportunity, and motive to do so. The computer evidence strongly supported the manner and timing of the sexual abuse as alleged by S.R. The timing evidence tended to show that the sexual abuse occurred in August and September 2005, in

effect mooting the testimony of other witnesses that they observed nothing unusual in the family relationships in July 2005. Had Petitioner possessed a good explanation for accessing the pornographic websites when Nancy was away from home or sleeping, he would have provided it at the post-conviction hearing. Instead, Petitioner avoided testifying about these difficult topics.

Based on the totality of the record, including the evidence that was favorable and unfavorable, Petitioner's missed opportunity to testify did not have a substantial and injurious effect on the trial and did not amount to a harmful error. Therefore, federal habeas corpus relief will not be granted.

(4) Ineffective Assistance of Counsel Theory

The record above reflects that Mr. Marshall and Mr. Ramalingam were not deficient in advising Petitioner to refrain from testifying at trial, and that Petitioner could have insisted on testifying. Petitioner hired lead counsel for his particular expertise in sexual abuse cases, and Petitioner knowingly, voluntarily, and intelligently followed both counsels' advice not to testify. The record does not reflect that the attorneys made the decision over the protests of the client; instead, the record reflects that they recommended that he not testify, and that it was his decision to follow their recommendation by not finding other counsel or notifying the trial court that he wanted to testify. No United States Supreme Court precedent exists to support Petitioner's position that a defendant who knows he has the right

to testify must be advised specifically that he has a "right" to "override" his attorney's advice.

Petitioner's counsel crafted an elaborate defense based on the difficult life history and prisoner abduction fantasies of the child, supported by an expert witness and several lay witnesses. Defense counsel shored up the defense with additional sub-strategies, including casting doubt on the computer analysis, showing the severe neglect the child experienced in her mother's household, suggesting that the child learned her vocabulary of sexual terms and saw pornography in her mother's household, demonstrating through an expert how thin the walls were at the mobile home where the abuse allegedly occurred, and getting in much of what Petitioner could have testified to through his wife, Nancy, without subjecting Petitioner to cross-examination. Therefore, the Court cannot conclude that Petitioner's counsel performed deficiently by advising Petitioner not to testify but failing to tell him he could override that advice when they believed his testimony would destroy his case.

The Court agrees that the record reflects Petitioner's guilt, both under *Strickland*'s actual prejudice standard or *Brecht*'s substantial and injurious effect standard, and there is not a reasonable probability that, adding Petitioner's testimony to the mix, the outcome of the trial would have been different. Accordingly, Petitioner has not shown that the Idaho Court of Appeals's decision

was contrary to, or an unreasonable application of, the law governing the right to effective assistance of counsel. Relief under § 2254(d)(1) or (2) is not warranted.

**4.      Ineffective Assistance of Counsel: Failure to Properly Prepare for Trial by Failing to Subpoena Key Witnesses**

Petitioner's second claim is that counsel failed to investigate, locate, and present witnesses' testimony that could have affected the jury's evaluation of the truthfulness of the prosecution witnesses. He alleges that counsel admitted they were unprepared at trial, and the court charged both counsel with contempt of court and fined them $500.00 each. The Petition does not identify which witnesses counsel should have subpoenaed, nor does he provide information about the subject matter of the potential witnesses' testimony. Petitioner's state court petition and his Reply in this case focus on the testimony of Dr. Schmidt, who treated S.R. for various childhood illnesses.

Mr. Marshall testified at the post-conviction hearing that he had only a faint recollection of Dr. Schmidt, but that he believed Dr. Schmidt would have testified "that he had seen [the child] several times and on no occasion had she said anything that suggested she was being molested by her father and on no occasion had he observed anything that suggested she was being molested by her father." (States' Lodging C-2, p. 52.)

The state district court determined that the failure of counsel to subpoena Dr. Schmidt was deficient performance. (State's Lodging C-1, pp. 235-36.) However, the court next determined that Petitioner had failed to show prejudice resulting from the deficient performance for the following reasons: (1) "Although Dr. Schmidt is a children's doctor, and thus may have some knowledge about how to spot signs of physical, and perhaps even sexual abuse, he is not a trained child psychologist"; (2) Dr. Schmidt "only saw [the child] in order to evaluate her physical condition as it related to common childhood ailments such as colds, [and] [t]herefore, . . . his testimony about not noticing any signs of sexual abuse would [not] have carried much weight in the minds of the jury"; (3) although Dr. Schmidt may have testified that he saw [the child] more often than is typical for children of that age,

. . . it is highly improbable that [the child] would have developed a relationship with him comfortable enough to discuss any abuse she was suffering"; (4) Mr. Rossignol or his wife Nancy took [the child] to the doctor, and when [the child] told Nancy she was being abused, Nancy told [the child] she didn't believe her"; (5) [the child] testified that Mr. Rossignol told her that if she ever told anyone about the abuse that she and Nancy would be homeless";[11] and (6) "even such a

---

[11] This statement is a clear factual error. As noted above, it was Nancy, not Petitioner, who told S.R. that she and Nancy might become homeless if S.R. made allegations of sexual abuse to anyone outside the family and caused Petitioner to be taken away. However, that statement does not make the

small gap in time would be enough time for physical signs of abuse, such as bruises, to disappear." (State's Lodging C-1, pp. 236-37.)

The Idaho Court of Appeals concluded that Petitioner did not show how he suffered prejudice from the failure of his defense counsel to call Dr. Schmidt to testify at trial. The Court of Appeals pointed out that Petitioner had failed to "present an affidavit from the doctor . . . confirming what the doctor would have testified to." As a result, the Court of Appeals concluded Petitioner's "allegation as to how the doctor would have testified is merely speculative." (State's Lodging D-5, p. 14.) Petitioner may not simply speculate as to the purported content of the doctor's trial testimony (Reply, Dkt. 22, p. 19); he must have provided an affidavit, report, or deposition transcript of the doctor on post-conviction review.

Petitioner places too much value on the unknown testimony of a witness with only peripheral experience with the victim and her circumstances. Certainly, a doctor's license and status may lend credibility to his testimony. What is known of this doctor is that he saw the child slightly more often than he would see other patients. Dr. Schmidt's medical records were admitted into evidence for the jury to

---

state court's entire finding an unreasonable determination of the facts under § 2254(d)(2), because, omitting this fact still produces a conclusion that (1) the child had reason to think reporting the sexual abuse could have negative consequences, (2) the child had no reason to confide in Dr. Schmidt, (3) Dr. Schmidt had no reason to examine or question the child for signs of sexual abuse (for example, there were no reports that Dr. Schmidt examined the child's genitalia during the pertinent time period); and (4) the young child has no reason to know that a medical doctor is the type of professional to whom it would be appropriate to report sexual abuse.

examine. (State's Lodging A-13, p. 1224-126.) Dr. Schmidt's custodian of records testified that S.R. was seen in the office between 2004 and August 2005. (*Id.*, p. 1229.)

The purported testimony from this doctor that he did not detect any child abuse in the examinations of the child would have been cumulative of the testimony of the mother and grandmother that they did not detect any signs of child abuse, and both individuals had significantly more contact and a significantly closer relationship with S.R. than Dr. Schmidt. Because Petitioner did not meet his burden of proof on post-conviction review, nor does he do so here, he has not shown that his defense was prejudiced by this omission of counsel.

Therefore, even presuming deficient performance of counsel, Petitioner has not shown that the Idaho Court of Appeals's decision that he suffered no prejudice was contrary to, or an unreasonable application of *Strickland,* under the doubly-deferential habeas standard explained in *Harrington*. Thus, federal habeas corpus relief is not warranted.

**5.      Claim 3: The Trial Court Hindered Petitioner's Defense**

Petitioner's third claim is that the trial court hindered Petitioner's ability to present a defense by changing its ruling regarding the admissibility of certain evidence. Petitioner brings this as both a Due Process Clause claim and a Confrontation Clause claim. Part of Petitioner's defense was that the victim had

learned the sexual terminology she repeated to Ms. Hill and others ("massaging" and "hole"), while she was residing in Wyoming with her mother and half-sister (C.B.), rather than from Petitioner. (State's Lodging B-3, p. 12.)

Before trial, the state district court determined that the entire Detective Lehmbecker interview transcript with S.R. would not be admitted unless Petitioner offered evidence that the victim had recently fabricated her account of the abuse or had a motive to fabricate her story. The state district court determined that the prior consistent statements of several witnesses, including the interview transcript, were not admissible because they were repetitive accounts of the same testimony expected from the victim at trial. Therefore, the state district court granted a motion in limine to prevent the State from introducing the entire interview transcript.

At trial, Petitioner introduced a portion of a Wyoming police report showing that the half-sister, C.B., had accused another man of sexually abusing C.B. when S.R. and C.B. lived together at their mother's residence. In the report, C.B. used the words "massage" and "hole" to describe the alleged sexual abuse. The report was proffered to show that S.R. learned these words from C.B. in Wyoming, not from any sexual abuse that took place in Idaho. (State's Lodging A-14, pp. 1537-38.)

To rebut that defense, the State asked to introduce as evidence additional portions of the transcript of the interview between S.R. and Detective Lehmbecker. The transcript was to be offered to "show that the victim used terminology that was in addition to, and different than, the terms she was exposed to in Wyoming." (*Id.*)

The prosecutor explained:

> I would like to have additional portions of the interview of [S.R.] on September 28th admitted. And this would be to rebut the defense's argument that [S.R.] only made this allegation or got the words because of the terms [C.B.] used when she reported sexual abuse, the terms massaging and the terms, hole. I think given the Defendant's argument that [S.R.] got these words from [C.B.], and she used those words to fabricate her story. The jury should know that [S.R.] should know [sic] the exact words that [S.R.] used when she first disclosed it to Detective Lehmbecker. What I have is a portion. I think it's five different portions of the interview of September 28th, a total, if I remember, of approximately ten minutes that would go through and show the exact words that [S.R.] used.

(State's Lodging A-14, pp. 1527-28.)

The prosecutor argued that the interview showed that S.R. not only used the words "massage" and "hole" to describe the alleged abuse that occurred at the hands of Petitioner, but she also used the word "penis" to indicate her vagina (as she did in trial) and she used the word "boobs." (State's Lodging A-14, p. 1539-40.) The prosecutor further argued:

> The jury should know that [S.R.] used a lot of words besides and in addition to what [C.B.] did. The State cannot fully rebut that

argument without having this part of the interview before the jury. She used different words today. She's a year and half older than when she was at that time. And the jury – the words that she used today the jury could just infer that it was because of that year and half, not because of different words used at that time.

(*Id.*, p. 1540.) The trial court further noted:

[T]he licking [oral-genital contact alleged by S.R.] and those sorts of things go beyond anything that has been described that she would have known in Wyoming. And it's not just the terms. A key part of your defense, Mr. Marshall, is that the only way she could have invented this is because of her experience in Wyoming. That, there was nothing that happened when she came to Moscow that would have enabled her to have given the tale that she did, and I think this directly rebuts that.

State's Lodging A-14, p. 1548.)

The trial court determined that the additional transcript was proper rebuttal that was "not being offered for the truth of the matter asserted but rather the range of her descriptions." (State's Lodging A-14, p. 1452.) The defense asserted that it would be too hard for the jury to distinguish using it for the truth of the matter or for a limited purpose; the trial judge responded that he would "be forceful in my qualification of it. I mean, I'm serious when I say they may not. And I'm not going to permit the playing of the disc.... So I will just let them read the transcript." (*Id.*, pp. 1544-47.) The state district court instructed the jury twice that the transcript "was not to be used as evidence that what the victim state occurred actually took place." (State's Lodging B-3, p. 12.)

The Idaho Court of Appeals rejected Petitioner's due process argument, finding that "there is no inconsistency shown by Rossignol between the district court's pretrial ruling and its decision to admit the transcript at trial." (State's Lodging B-3, p. 12.) The Court of Appeals also rejected the confrontation argument, citing the fact that the court offered Petitioner the opportunity to recall the victim, and he declined. (*Id.*)

## A. *Due Process*

The Sixth and Fourteenth Amendments guarantee criminal defendants a meaningful opportunity to present evidence in support of a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 689-690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). The right is subject to reasonable restrictions based upon other legitimate interests in the criminal trial process. *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted).

Federal habeas review of state court evidentiary rulings is limited. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Only state evidentiary rulings that "serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote" will implicate a defendant's right to due process of law. *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). A state court's evidentiary ruling will not provide a basis for habeas

relief unless it "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67-68).

Petitioner argues that the court's changed ruling– admitting additional portions of the transcript for the limited purpose of showing a prior consistent statement– deprived him of the right to present a complete defense. Petitioner's trial counsel argued: "In-limine rulings were law of the case and absent a change in material circumstances they should not be changed." (State's Lodging A-15, p. 1562-63.) The trial court responded that, at the last trial, the transcript was admitted for the truth of the matter, and at the second trial, the excerpts were being admitted not for the substance; therefore, the ruling was not inconsistent with the pretrial ruling. (*Id*, p. 1563.)

The record shows that the trial court's ruling remained consistent with its earlier ruling–that the interview transcript could not be used for substantive evidence that Petitioner committed the crime. The court issued a limiting instruction to the jury, both oral and written.

Petitioner argues that the court admitted only a limited portion of the transcript, about 45 minutes of a three-hour interview, and the jury's inability to hear the entire interview prejudiced him. However, Petitioner did not ask for the

entire transcript to be admitted at trial, nor has he shown how any omitted portions of the interview would have aided his case.

Accordingly, Petitioner has not shown that the ruling arose to the level of a due process violation. Petitioner is not entitled to habeas corpus relief under § 2254(d)(1) or (2).

**B.** *Confrontation Clause*

The Confrontation Clause of the Sixth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. The "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 315-316 (1974). A trial judge is permitted to impose reasonable limits on cross-examination, without violating a defendant's right to confrontation, based "on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Ardsall*, 475 U.S. 673, 679 (1986). In other words, "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original).

It is clear that the state district court's ruling provided Petitioner with the opportunity to recall the victim to confront her about the statements made in the

interview transcript. (State's Lodging A-15, pp. 1563-64.) Petitioner argues that he preferred not to have to cross-examine S.R. "about her inconsistent statement in front of so many people," because it "could cause more harm with the jury." (Reply, Dkt. 22, p. 23.) However, this concern is not a right that is embodied in the Confrontation Clause; rather, it is a strategy choice.

Petitioner also alleges that the court would not allow him to recall other pertinent witnesses, such as the investigators, to examine them about the Health and Welfare investigative methods. Petitioner has not pointed to places in the trial transcript showing where he asked to recall these witnesses, and the state court refused. Nor has he shown the substance of the testimony that these witnesses would have given on recall examination.

In addition, Petitioner has not asserted any particular prejudice that would have arisen from recalling the victim after the Court changed its ruling, for example, due to Petitioner's lack of preparation or for any other reason. Counsel also had overnight to prepare. The transcript was largely consistent with what S.R. testified to at trial. Petitioner had been in possession of the entire transcript throughout the proceedings, and, thus, any "surprise" would have been minimal. Further, Petitioner had been informed by the court prior to trial that the ruling was tentative and could be changed based upon presentation of the evidence–for example, if Petitioner offered evidence that the victim had recently fabricated her

account of the abuse or had a motive to fabricate her story. Petitioner, in fact, presented several motives–that Petitioner gave away S.R.'s hamster and grounded her from television. Therefore, Petitioner should have been prepared for introduction of the transcript evidence.

For these reasons, the Court concludes that Petitioner has failed to show that the Idaho Court of Appeals's decision was contrary to, or an unreasonable application of, governing United States Supreme Court precedent regarding the Confrontation Clause. Accordingly, Petitioner is not entitled to relief on this claim.

**6.      Conclusion**

After reviewing the state court record and the record before this Court, and after considering the arguments of the parties, the Court concludes that Petitioner has presented no set of facts or legal theories that warrant habeas corpus relief. Accordingly, the Court will deny the Petition for Writ of Habeas Corpus and dismiss this case with prejudice.

**7.      Certificate of Appealability**

The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(C); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the

Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request with that court.

## ORDER

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED and DISMISSED with prejudice.

2. The Second Motion for Extension of Time to File Response (Dkt. 19) is GRANTED. The Response (Dkt. 20) has been considered.

3. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. If he wishes to proceed to the United States Court of Appeals for the Ninth Circuit, Petitioner must file a notice of appeal in this Court **within thirty (30) days after entry of this Order**, and he may file a motion for COA in the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b)(2).

DATED: March 31, 2014

Honorable Candy W. Dale
United States Magistrate Judge